BUENA VISTA LOAN & SAVINGS BANK *v.* GRIER *et al.*

1. Consenting in term to an order empowering the presiding judge to try a case in vacation estopped a party thereto, who at the time of agreeing to the order knew that the judge was related to persons interested in the result of the case, from raising, when it came on for a hearing under the order, any question as to the judge's disqualification on the ground of relationship ; and this is so although such party did not, at the time of joining in the consent order, know what was the judge's relationship to those parties, and although it was in point of fact within the fourth degree of consanguinity.
2. The mere fact that a certificate of stock in a corporation embraced a recital that the same was "transferable in person or by attorney only on the books of the company on surrender of this certificate " did not ipso facto give to the corporation any lien upon such stock.
3. When property pledged to secure a debt is, while in the possession of the pawnee, levied upon under an execution in favor of another against the pawner, and the pawnee pursues the remedy pointed out in section 2962 of the Civil Code, he need not formally foreclose the lien on the property given him by section 2959, but is entitled to have the same enforced for his benefit under the provisions of the section first cited.
4. When money arising from a sale under execution is, upon a rule to distribute the same, awarded to one holding a lien superior to that under which the sale was had, the fund is taxable with all the expenses of bringing it into court, but not with the costs incurred in obtaining the execution.

Argued November 22, — Decided December 12, 1901.

Rule to distribute money.    Before Judge Butt.    Marion superior court.    January 29, 1901.

*Goetchius & Chappell,* for plaintiff in error.
*Charlton E. Battle,* contra.

 LUMPKIN P. J.    The Buena Vista Loan and Savings Bank obtained a judgment against T. T. and B. S. Miller, and under an execution issued thereon the sheriff seized and sold certain shares of the stock of that bank as the property of the Millers.    Their indebtedness to the bank began in 1894, and was then evidenced by promissory notes.    They were renewed from time to time until February 6, 1897, when the Millers executed and delivered to the

bank five notes, aggregating in principal $1,423.75. On these the judgment above mentioned was founded. R. S. Grier brought a rule against the sheriff for the proceeds of the sale of the stock just referred to, setting up that he was entitled to the same upon the foreclosure of a lien which he had acquired by reason of the fact that this stock had been pledged to him by the Millers as security for a loan to them, evidenced by a promissory note dated March 21, 1896, and due on the 21st day of November thereafter. The pledge of the stock was made on April 17, 1896. By consent of the parties an order was entered that the case be heard and determined by the presiding judge in vacation without the intervention of a jury. When the case came on to be heard under the order, the bank raised the question that the judge was disqualified by relationship to some of its stockholders within the fourth degree of consanguinity. He overruled this objection, tried the case, and rendered a judgment taxing the fund in the sheriff's hands with the costs of the rule and the expenses of the sheriff's sale, and awarding the balance to Grier. Thereupon the bank sued out a bill of exceptions and brought the case here upon assignments of error which will now be taken up and considered.

1. The first is that the judge erred in overruling the bank's objection to his trying and disposing of the case. It appeared that, in point of fact, he was related to some of the stockholders of the bank as alleged, but it also appeared that, at the time the above-mentioned consent order was agreed upon, the officials of the bank in charge of its affairs, and its counsel, knew that he was related to these parties. They did not, however, know the precise degree of relationship. Nevertheless we agree with his honor of the trial bench in holding that the objection to his trying the case came too late. The fact of relationship being known to the bank, it was certainly charged with the duty of ascertaining what the degree of the relationship was. If those who were conducting its affairs chose, without investigating this matter, to join with Grier in a consent that the judge should hear and dispose of the case in vacation, the bank was bound by their undertaking, and was at the hearing properly denied the right to take advantage of their gross inattention in the premises. To hold otherwise would subject Grier to a hardship. He was ready to try the case at the term when it was called, and it was the duty of the judge, if disqualified, to procure

the services of a judge who was not. Had the objection made to the judge in vacation been sustained, Grier would have lost a term entirely through the fault or negligence of the opposing party.

2. Each of the certificates evidencing the fact that the Millers held stock in the bank embraced a recital that the shares therein named were "transferable in person or by attorney only on the books of the company on surrender of this certificate." In pledging the stock to Grier, the Millers did not undertake to have such a transfer made on the books of the bank. Upon this fact the bank, although its judgment was rendered long after the stock had been placed in the hands of Grier, insisted that it was entitled to priority over him in the distribution of the proceeds of the sale of the stock. There was no evidence to show that the bank had, prior to the rendition of its judgment, any lien whatever upon the stock, either under its charter or by virtue of any by-law, or under any statute, or by contract with the Millers. Indeed, its claim of priority was based entirely upon the naked fact that the stock had not been transferred on the books of the bank. In support of this contention reliance was had upon section 1855 of the Civil Code, which reads as follows: "Except as against the claims of the corporation, a transfer of stock does not require a transfer on the books of the company." This section was evidently codified from a decision rendered by this court in the case of *Southwestern R. Co.* v. *Thomason,* 40 *Ga.* 408. A clear light is shed upon the meaning of the section by the following language used by McCay, J., on page 411: "The transfer upon the books is only for the protection of the company; it may have liens upon the stock, or it may require this mode in order that its own management may be complete and within its grasp." The phrase, "except as against the claims of the corporation," appearing in the section cited, was certainly not designed to confer upon the corporation any lien of any description. The object of the section clearly was to protect the corporation in the enforcement of such claims as it actually had. If, as suggested by the learned judge quoted above, it in fact had a lien upon the stock, a transfer of the same without the knowledge or consent of the corporation would not affect its rights. In this connection it may be suggested that it is, of course, always important for a corporation to know who its real shareholders are. Being bound to pay dividends to the rightful owners of its stock,

it must have a system which will at all times enable it to determine who, relatively to this matter, the stockholders are. But we hazard little, we think, in holding that the section of the code under consideration should never be given the effect of creating liens in favor of corporations against their stockholders.

3. During the progress of the trial, while T. T. Miller was testifying in behalf of Grier, he was asked when the note given by himself and B. S. Miller to Grier became due. The testimony thus sought to be elicited was objected to on the ground that it was not permissible to vary by parol the terms of the note. The objection was overruled, and the witness testified that the "note was extended from time to time on payment of interest, and finally became due the 11th day of April, 1899, the date of the last payment; it was extended by oral agreement from time to time as the interest was paid." When Grier tendered in evidence his execution against the Millers issued upon the foreclosure of his lien, together with the affidavit of foreclosure, it appeared that the latter was dated March 30, 1900. These documents were objected to on the ground that they did not show that the foreclosure was had within twelve months from the maturity of the debt. The objection was overruled and the papers admitted. The contention of counsel for the bank was that, as the lien of Grier was not foreclosed within twelve months from the 21st of November, 1896, the entire proceeding was void, and therefore they took the position that evidence tending to show a foreclosure at a later period was irrelevant and inadmissible. It appeared that after the bank stock had been levied on by the sheriff, Grier gave notice to the levying officer that he claimed a lien on this property as pawnee, and would claim the proceeds of the sale. This notice was given under section 2962 of the Civil Code. Under the facts appearing, we do not think it was necessary for Grier to foreclose at all. He had a statutory lien on the stock in his hands. Civil Code, § 2959. It was, under section 2958, his right to sell the pledged property after giving to the pawner due notice of his intention so to do. The law embraced in the section last cited is, however, qualified by the provisions of section 2818, which limits the right of a pawnee to sell pledged property where he has notice of a conflicting lien. In that event he must foreclose his lien in the manner pointed out in section 2816. Construing all these sections together, we under-

stand the law to be this: The pawnee may sell the pledged property and thus satisfy his claim, when there is no conflicting lien of which he has notice. If he does have notice of such a lien, he may foreclose under the provisions of section 2816, provided he chooses to adopt this method of enforcing his rights; but he need not foreclose at all when the property is seized under execution in favor of another. He may then give the notice provided for by section 2962, and claim the proceeds of the sale in the hands of the levying officer; in which event "the court, in distributing the proceeds, will recognize his lien according to its dignity, and give such direction to the funds as shall protect his legal rights." It therefore made no difference in the present case whether the objection to Grier's foreclosure proceeding was good or not, for his case fell within the provisions of the code section last cited. Of course he did not, while holding the pledged property in his hands, lose the lien given him by law merely because he indulged his debtors by extending the time of payment.

4. The only remaining assignment of error in the bill of exceptions is one relating to the court's refusal to order the payment out of the money in the sheriff's hands of the cost incurred by the bank in obtaining its judgment against the Millers. There certainly was no error in this. The court did charge the fund with the expenses incident to bringing it into court. This was proper, for these expenses were incurred in favor of the party to whom the money was awarded, and therefore should have been borne by him. The costs of obtaining the judgment in favor of the bank were not, however, expenses incurred for the benefit of Grier, but solely for the benefit of the bank itself. Indeed, there was no more reason for paying these costs out of the fund in controversy than for paying the principal and interest due of the bank's judgment.

*Judgment affirmed. All the Justices concurring.*